IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-529

Filed 7 May 2024

Forsyth County, No. 21 CVS 6259

ELIZABETH AND JASON WHITE, Petitioners,

v.

NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES, FORSYTH COUNTY DEPARTMENT OF SOCIAL SERVICES and CHILDREN'S HOME SOCIETY OF NORTH CAROLINA, INC., Respondents.

Appeal by respondents from order entered 16 September 2022 by Judge William Long in Forsyth County Superior Court. Heard in the Court of Appeals 9 January 2024.

*TBM LAW, PLLC, by Tiffany B. Massie, for petitioners-appellees.*

*Attorney General Joshua H. Stein, by Assistant Attorney General Adrian W. Dellinger, for respondent-appellant North Carolina Department of Health and Human Services.*

*Assistant County Attorney Erica Glass for respondent-appellant Forsyth County Department of Social Services.*

*Hill Evans Jordan & Beatty, PLLC, by Michele G. Smith, for respondent-appellant Children's Home Society of North Carolina, Inc.*

ZACHARY, Judge.

This case concerns the superior court's limited standard of review when acting as an appellate tribunal upon a petition for judicial review from the final decision of an administrative agency pursuant to N.C. Gen. Stat. § 150B-43 (2023).

Respondents North Carolina Department of Health and Human Services ("DHHS"), Forsyth County Department of Social Services ("DSS"), and Children's Home Society of North Carolina, Inc., ("CHS") appeal from the superior court's order (1) reversing DHHS's final decision denying Petitioners Elizabeth and Jason White's request for adoption assistance benefits for their adopted child, "CW";[1] (2) awarding Petitioners ongoing and retroactive adoption assistance benefits; and (3) awarding attorney's fees to Petitioners. After careful review, we reverse the superior court's order, which reversed the final decision of DHHS.

## I.    Background

The subject matter of this appeal is the adoption assistance benefits program under Title IV-E of the Adoption Assistance and Child Welfare Act of 1980. *See* 42 U.S.C. § 670 *et seq.* Although the adopted child in this case clearly has extensive needs, he does not meet the eligibility requirements for adoption assistance benefits under Title IV-E. In concluding otherwise, the trial court exceeded its limited authority under N.C. Gen. Stat. § 150B-43.

As this appeal relates to the State's determination of an adopted child's eligibility for Title IV-E adoption assistance benefits—an issue grounded in federal and state law—we begin with an overview of the applicable statutes, regulations, and agency guidance.

---

[1] We adopt the initials used by the parties to protect the identity of the juvenile.

## A. Applicable Legal Principles

Title IV-E provides federal funding for adoption assistance subsidies to States that develop a plan for a subsidy and maintenance program and obtain approval of that plan from the United States Secretary of Health and Human Services. 42 U.S.C. § 670.[2] Title IV-E requires that "[e]ach State having a plan approved under this part shall enter into adoption assistance agreements . . . with the adoptive parents of children with special needs." *Id.* § 673(a)(1)(A). DHHS supervises North Carolina's adoption assistance payments program. N.C. Gen. Stat. § 108A-25(a)(4).

"The primary goal of the [T]itle IV-E adoption assistance program is to provide financial support to families who adopt difficult-to-place children from the public child welfare system. These are children who otherwise would grow up in State foster care systems if a suitable adoptive parent could not be found." U.S. Dep't of Health & Hum. Servs., Admin. for Child., Youth & Fams., Pol'y Announcement, Log No. ACYF-CB-PA-01-01, at 12–13 (Jan. 23, 2001) ("Federal Policy Announcement"). "The [T]itle IV-E adoption assistance program, therefore, was developed to provide permanency for children with special needs in public foster care by assisting States in providing ongoing financial and medical assistance on their behalf to the families who adopt

---

[2] Between 2014, the year of CW's birth and adoption, and 2021, when Petitioners first applied for adoption assistance benefits, the relevant federal and state provisions were amended several times. *See, e.g.*, Fostering Connections to Success and Increasing Adoptions Act of 2008, Pub. L. 110-351, §§ 101(b), (c)(1), (c)(5), (f), 402, 122 Stat. 3949. As these amendments do not alter the substance of our analysis, for ease of reading, we refer to the laws and regulations currently in effect, except where indicated.

them." *Id.* at 2.

Title IV-E provides specific requirements that children with special needs must meet in order to qualify for adoption assistance benefits. 42 U.S.C. § 673(a)(2)(A). The numerous eligibility requirements differ based on the child's age and circumstances, *id.*, but at all times relevant to this appeal, a child was required to meet Title IV-E's definition of "a child with special needs" to be eligible for adoption assistance benefits, *id.* § 673(a)(1)(B), (c).

In considering whether a child is "a child with special needs" under Title IV-E, the State must determine, *inter alia*,

> that there exists with respect to the child a specific factor or condition (such as his ethnic background, age, or membership in a minority or sibling group, or the presence of factors such as medical conditions or physical, mental, or emotional handicaps) because of which it is reasonable to conclude that such child cannot be placed with adoptive parents without providing adoption assistance under this section[.]

*Id.* § 673(c)(1)(B). The State must also conclude, subject to certain exceptions not applicable to the case before us, that "a reasonable, but unsuccessful, effort has been made to place the child with appropriate adoptive parents without providing adoption assistance under this section[.]" *Id.*

Additionally, for Title IV-E adoption assistance benefits to be available, the State agency and the prospective adoptive parents must enter into an adoption assistance agreement before the adoption becomes final. *See* Federal Policy

Announcement, at 6 ("Title IV-E adoption assistance is available on behalf of a child if s/he meets all of the eligibility criteria and the State agency enters into an adoption assistance agreement with the prospective adoptive parent(s) **prior to** the finalization of the adoption."); *see also* 45 C.F.R. § 1356.40(b)(1) (2023) (requiring that any adoption assistance agreement "[b]e signed and in effect at the time of or prior to the final decree of adoption").

In addition to these federal laws and regulations—of which we have only articulated those pertinent to the present case—North Carolina laws and regulations also bear on a child's eligibility for adoption assistance benefits. DHHS and DSS have statutory authorization to administer the adoption assistance program "under federal regulations" and state rules promulgated by the Social Services Commission. N.C. Gen. Stat. § 108A-25(a). Further, our General Statutes provide:

> Adoption assistance payments for certain adoptive children shall be granted in accordance with the rules of the Social Services Commission to adoptive parents who adopt a child eligible to receive foster care maintenance payments or supplemental security income benefits; provided, that the child cannot be returned to his or her parents; and provided, that the child has special needs which create a financial barrier to adoption.

*Id.* § 108A-49(b).

At the time of CW's adoption in 2014, the North Carolina Administrative Code enumerated specific eligibility criteria for the receipt of adoption assistance benefits, including that "[t]he child is, or was, the placement responsibility of a North Carolina

agency authorized to place children for adoption at the time of adoptive placement"; that "[t]he child has special needs that create a financial barrier to adoption"; and that "[r]easonable but unsuccessful efforts have been made to place the child for adoption without the benefits of adoption assistance[.]" 10A N.C. Admin. Code 70M.0402(a)(2)–(4) (2014).[3] The Administrative Code also included the requirement that "the adoptive parents must have entered into an agreement with the child's agency prior to entry of the Decree of Adoption." 10A N.C. Admin. Code 70M.0402(b)(4) (2014).

## B. Factual and Procedural Background

CW was born prematurely in North Carolina on 28 May 2014. CW's mother exposed CW to various illegal substances in utero. On 31 May 2014, CW's mother relinquished her parental rights to CW to CHS for the purpose of adoption with prospective adoptive parents. CHS is a private, not-for-profit child-placement agency. In June 2014, CHS placed CW with Petitioners in a potential adoptive placement, which was formalized on 10 September 2014 following the termination of CW's putative biological father's parental rights. Petitioners formally adopted CW on 23 December 2014. At the time of the adoption, there had been no discussion of adoption assistance benefits, and no adoption assistance agreement established.

---

[3] Presently, the North Carolina Administrative Code explicitly incorporates by reference the eligibility criteria for adoption assistance benefits found in 42 U.S.C. § 673(a)(2). *See* 10A N.C. Admin. Code 70M.0402(a)(2) (2023).

In the years since his adoption, CW has been diagnosed with attention-deficit/hyperactivity disorder and various ocular conditions. CW has also been evaluated for possible autism spectrum disorder on multiple occasions.

In March 2021, Petitioners first discussed the possibility of receiving adoption assistance benefits with CHS's Infant Connections Program Supervisor. Petitioners and the CHS supervisor completed an adoption assistance eligibility checklist, and Petitioners submitted an application for adoption assistance on 10 May 2021. Upon receipt of the application, a DSS agent "inquired if there was a date scheduled for finalizing the adoption as 'the adoption agreement will have to be completed and signed prior to finalizing' the adoption." The CHS supervisor informed the DSS agent that "the adoption was finalized in 2014"; that "an adoption assistance application was not completed at that time"; and that "[t]his was a private adoption where [CHS] was the legal guardian prior to the adoption being finalized."

On 27 May 2021, DSS determined that CW "was not eligible for Adoption Assistance as his adoption was finalized in 2014 prior to entering into an adoption assistance agreement[.]" Petitioners appealed DSS's decision to DHHS, and a local hearing was held on 21 July 2021. On 23 July 2021, the local hearing officer affirmed DSS's decision.

On 28 July 2021, Petitioners filed a request for a state appeal, and DHHS held a state hearing on 22 September 2021. On 29 September 2021, the state hearing officer affirmed DSS's decision. Petitioners contested the state hearing officer's

decision, and on 24 November 2021, the assistant chief hearing officer entered a final decision affirming DSS's decision.

On 21 December 2021, Petitioners filed a petition for judicial review in Forsyth County Superior Court pursuant to N.C. Gen. Stat. § 108A-79(k). Petitioners named DHHS, DSS, and CHS as respondents. On 12 September 2022, the matter came on for hearing. By order entered on 16 September 2022, the superior court concluded that "Respondents' decision to deny Petitioners' request for adoption assistance was erroneous, arbitrary, capricious and an abuse of discretion, and should be reversed[.]" The superior court also concluded: "Based on CW's past and present medical history and circumstances, CW qualified as a 'special needs' child in 2014, and he still meets those qualifications today . . . ."

Consequently, the superior court concluded that "Petitioners are entitled to receive adoption assistance both from the date of this Order, and retroactive assistance to December 23, 2014[.]" The superior court remanded the matter "to Respondents for a determination of the amount of adoption assistance to which Petitioners are entitled" and for the execution of "all necessary documents in order for Petitioners to receive adoption assistance retroactive to December 23, 2014 and continuing thereafter as long as CW meets eligibility requirements[.]" The court also awarded Petitioners $10,750.00 in attorney's fees.

Respondents each filed timely notices of appeal. DHHS also filed a motion to stay execution of the superior court's order pending appeal, which the superior court

denied by order entered on 16 December 2022.

## II. Discussion

On appeal, Respondents each raise several arguments contending that the superior court's order must be reversed. For the reasons that follow, we agree.

## A. Standard of Review

The North Carolina Administrative Procedure Act ("APA"), "codified at Chapter 150B of the General Statutes, governs trial and appellate court review of administrative agency decisions." *Amanini v. N.C. Dep't of Hum. Res.*, 114 N.C. App. 668, 673, 443 S.E.2d 114, 117 (1994). A party aggrieved by the final decision of an administrative law judge in a contested case has a right to judicial review by the superior court. N.C. Gen. Stat. § 150B-43.

Under the APA, the superior court's scope of review is limited:

> The court reviewing a final decision may affirm the decision or remand the case for further proceedings. It may also reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the findings, inferences, conclusions, or decisions are:
>
> > (1) In violation of constitutional provisions;
> >
> > (2) In excess of the statutory authority or jurisdiction of the agency or administrative law judge;
> >
> > (3) Made upon unlawful procedure;
> >
> > (4) Affected by other error of law;
> >
> > (5) Unsupported by substantial evidence admissible under [N.C. Gen. Stat. §] 150B-29(a), 150B-30, or

9

> 150B-31 in view of the entire record as submitted; or

(6) Arbitrary, capricious, or an abuse of discretion.

*Id.* § 150B-51(b).

The APA provides a reviewing court with two different standards of review, "depend[ing] on the nature of the challenge being addressed." *Christian v. Dep't of Health & Hum. Servs.*, 258 N.C. App. 581, 584, 813 S.E.2d 470, 472, *appeal dismissed*, 371 N.C. 451, 817 S.E.2d 575 (2018).

> In reviewing a final decision in a contested case, the court shall determine whether the petitioner is entitled to the relief sought in the petition based upon its review of the final decision and the official record. With regard to asserted errors pursuant to subdivisions (1) through (4) of subsection (b) of this section, the court shall conduct its review of the final decision using the de novo standard of review. With regard to asserted errors pursuant to subdivisions (5) and (6) of subsection (b) of this section, the court shall conduct its review of the final decision using the whole record standard of review.

N.C. Gen. Stat. § 150B-51(c).

When applying de novo review, a reviewing court "considers the matter anew and freely substitutes its own judgment for the agency's." *Christian*, 258 N.C. App. at 584, 813 S.E.2d at 472 (citation omitted). "Using the whole record standard of review, [a reviewing court] examine[s] the entire record to determine whether the agency decision was based on substantial evidence such that a reasonable mind may reach the same decision." *Id.* at 584–85, 813 S.E.2d at 472.

Under the whole record standard of review, "a reviewing court is not free to weigh the evidence presented to an administrative agency and substitute its evaluation of the evidence for that of the agency." *Sound Rivers, Inc. v. N.C. Dep't of Envtl. Quality*, 385 N.C. 1, 3, 891 S.E.2d 83, 85 (2023) (citation omitted). "The 'whole record' test does not allow the reviewing court to replace the [agency]'s judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it de novo." *Thompson v. Wake Cty. Bd. of Educ.*, 292 N.C. 406, 410, 233 S.E.2d 538, 541 (1977); *see also N.C. Dep't of Env't & Nat. Res. v. Carroll*, 358 N.C. 649, 660, 599 S.E.2d 888, 895 (2004).

"A party to a review proceeding in a superior court may appeal to the appellate division from the final judgment of the superior court as provided in [N.C. Gen. Stat. §] 7A-27." N.C. Gen. Stat. § 150B-52. "The scope of review to be applied by the appellate court under this section is the same as it is for other civil cases. In cases reviewed under [N.C. Gen. Stat. §] 150B-51(c), the [superior] court's findings of fact shall be upheld if supported by substantial evidence." *Id.* On appeal from a superior court's order "reversing the decision of an administrative agency, our standard of review is twofold and is limited to determining: (1) whether the superior court applied the appropriate standard of review and, if so, (2) whether the superior court properly applied this standard." *McCrann ex rel. McCrann v. Dep't of Health & Hum. Servs., Div. of Mental Health, Developmental Disabilities & Substance Abuse Servs.*, 209 N.C. App. 241, 246, 704 S.E.2d 899, 903, *disc. review denied*, 365 N.C. 198, 710 S.E.2d 23

(2011).

## B. Analysis

In that we are reviewing an order of the superior court acting as a reviewing court, our first task under the APA is to determine "whether the superior court applied the appropriate standard of review[,]" *id.*, as governed by the type of error asserted by Petitioners, *see* N.C. Gen. Stat. § 150B-51(c). In their petition for judicial review below, Petitioners argued that DHHS's final decision was (1) based on an error of law, in that Respondents misinterpreted 42 U.S.C. § 673; and (2) arbitrary, capricious and an abuse of discretion, in that this alleged statutory misinterpretation resulted in Respondents' failing "to fulfill their duty to inquire as to CW's eligibility [for adoption assistance benefits] and inform Petitioners." *See id.* § 150B-51(b)(4), (6). Accordingly, the interpretation of 42 U.S.C. § 673 is a question of law reviewed de novo. *Id.* § 150B-51(c). We review the question of whether DHHS's final decision was arbitrary, capricious, and an abuse of discretion using the whole record test. *Id.*

After careful review, we conclude that the superior court exceeded its limited authority when reviewing DHHS's final decision. Accordingly, we cannot say that "the superior court properly applied th[ese] standard[s]" of review. *McCrann*, 209 N.C. App. at 246, 704 S.E.2d at 903.

We begin with the superior court's conclusion, upon reviewing the whole record, that "Respondents' actions surrounding this matter were arbitrary and capricious and in bad faith." The superior court reached this conclusion by reasoning

12

that "Petitioners did not meet the criteria for eligibility for adoption assistance when they applied ***only*** as a result of Respondents['] failure to adequately advise Petitioners of the availability of adoption assistance and the requirements of the same." This is incorrect.

Our careful review of the whole record suggests that, although CW has extensive needs, he did not meet the specific eligibility requirements for adoption assistance benefits, either at the time of his initial adoption in 2014 or when Petitioners submitted their application in 2021. Further, CW's ineligibility was not the result of any failure by CHS or DSS to adequately advise Petitioners about the program.

As stated above, federal and state law articulate specific eligibility requirements for adoption assistance benefits. Yet, the superior court determined that "CW would have been eligible to receive adoption assistance as of December 2014, and . . . it is clear that CW is still currently eligible to receive adoption assistance" without assessing whether CW met these requirements. For instance, there is no evidence in the record to suggest that CW was "eligible to receive foster care maintenance payments or supplemental security income benefits[,]" as required by our General Statutes. N.C. Gen. Stat. § 108A-49(b). By determining that CW was eligible for adoption assistance without satisfying this statutory requirement for eligibility, the superior court improperly "weigh[ed] the evidence presented to [DHHS] and substitute[d] its evaluation of the evidence for that of [DHHS]." *Sound*

*Rivers*, 385 N.C. at 3, 891 S.E.2d at 85 (citation omitted).

Section 108A-49(b) also requires that "the child ha[ve] special needs which create a financial barrier to adoption." N.C. Gen. Stat. § 108A-49(b). As stated above, in the context of adoption assistance, a determination of "special needs" requires, *inter alia*, the presence of "a specific factor or condition . . . because of which it is reasonable to conclude that such child cannot be placed with adoptive parents without providing adoption assistance[.]" 42 U.S.C. § 673(c)(1)(B). This determination also requires that "a reasonable, but unsuccessful, effort has been made to place the child with appropriate adoptive parents without providing adoption assistance under this section[.]" *Id.*; *see also* 10A N.C. Admin. Code 70M.0402(a)(4) (2014). In accord with these statutory and regulatory requirements, DHHS recognized in its final decision that "the evidence does not support that [CW] was 'un-adoptable' or hard to place due to special needs or that any efforts had to be made with other specialized adoption agencies or adoption exchanges in order to facilitate an adoption of [CW]."

Instead of "examin[ing] the entire record to determine whether [DHHS's] decision was based on substantial evidence such that a reasonable mind may reach the same decision[,]" *Christian*, 258 N.C. App. at 584–85, 813 S.E.2d at 472, the superior court made one finding of fact: "Respondents were well aware of CW's special needs prior to adoption, as CW received Medicaid from birth until shortly after the finalization of his adoption." The whole record does not support this finding, nor would this finding be dispositive of the legal issue of whether CW was "a child with

14

special needs" because this finding does not comport with the definition of the term "special needs" as used in the adoption assistance context.

Indeed, as regards these requirements, the superior court's determination of CW's eligibility is belied by the whole record. Not only was DHHS's decision "based on substantial evidence such that a reasonable mind may reach the same decision[,]" *Christian*, 258 N.C. App. at 584–85, 813 S.E.2d at 472, it is unreasonable to conclude that CW could not be placed with adoptive parents without adoption assistance when he *was*, in fact, placed with Petitioners without adoption assistance.

Moreover, because CW was plainly ineligible for Title IV-E adoption assistance benefits on these grounds, the whole record does not support the superior court's finding that "Petitioners did not meet the criteria for eligibility for adoption assistance when they applied **_only_** as a result of Respondents['] failure to adequately advise Petitioners of the availability of adoption assistance and the requirements of the same." Accordingly, the superior court erred by concluding that "Respondents' actions were without substantial justification," or that DHHS's final decision was "not supported by the whole record and [wa]s arbitrary, capricious and an abuse of discretion."

The superior court also did not dispute the federal and state regulatory requirement that the adoption assistance application be signed and approved before the adoption became final. *See* 45 C.F.R. 1356.40(b)(1); 10A N.C. Admin. Code 70M.0402(b)(4) (2014). DHHS cited these regulations in its final decision and

correctly observed that Petitioners' application did not comply with this requirement. Nonetheless, the superior court relied upon the existence of "extenuating circumstances"—namely, the perceived "arbitrary and capricious and bad faith" actions of Respondents—to conclude that "this matter [needed] to be re-opened and a subsequent determination [made] of CW's eligibility for adoption assistance."

North Carolina's appellate courts have never adopted or applied the "extenuating circumstances" doctrine when interpreting Title IV-E; however, other jurisdictions had adopted this doctrine prior to the 2001 issuance of the Federal Policy Announcement. As the Supreme Court of Pennsylvania explained in *Laird v. Department of Public Welfare*, a 1992 federal policy statement formed the basis for the extenuating circumstances doctrine. 23 A.3d 1015, 1024 (Pa. 2011). That earlier guidance "stated that adoptive parents would be eligible for a fair hearing if a state agency charged with the administration of adoption subsid[i]es failed to notify adoptive parents of the availability of subsidies[.]" *Id.*

The Federal Policy Announcement "clarified several outstanding adoption assistance questions, while also revoking fifteen previously issued policy statements and interpretations[,]" including the 1992 policy statement that formed the basis for the extenuating circumstances doctrine. *Id.* at 1025. Yet, as the *Laird* Court explained, the Federal Policy Announcement "did not abolish the extenuating circumstances doctrine; rather, it detailed various clarifications to it." *Id.*

Here, in its order, the superior court relied, in part, on the Federal Policy

Announcement, describing its guidance as follows:

   a. Adoption agencies, whether public or private, have an affirmative duty to notify prospective adoptive parents and prospective legal guardians of the availability of adoption assistance.

   b. *Failure by the State agency to advise potential adoptive parents about the availability of adoption assistance is an extenuating circumstance*, which justifies a fair hearing and a subsequent grant of adoption assistance if the child meets the eligibility requirements.

(Emphasis added).

It is true that the Federal Policy Announcement states that "the State or local [T]itle IV-E agency is responsible for assuring that prospective adoptive families with whom they place eligible children who are under their responsibility are apprised of the availability of [T]itle IV-E adoption assistance." Federal Policy Announcement, at 13. But the superior court overlooked the very next paragraph, which explains how that responsibility dissipates in cases such as this, in which the child was adopted through a private adoption agency, such as CHS, without the involvement or knowledge of the State or local Title IV-E agency.

The Federal Policy Announcement explains:

   However, in circumstances where the State agency does not have responsibility for placement and care, or is otherwise unaware of the adoption of a potentially special needs child, it is incumbent upon the adoptive family to request adoption assistance on behalf of the child. *It is not the responsibility of the State or local agency to seek out and inform individuals who are unknown to the agency about the possibility of [T]itle IV-E adoption assistance for special*

17

> *needs children who also are unknown to the agency*. This policy is consistent with the intent and purpose of the statute, and that is to promote the adoption of special needs children who are in the public foster care system.

*Id.* (emphasis added). Additionally, the Federal Policy Announcement reiterates that "[t]he right to a fair hearing is a procedural protection that provides due process for individuals who claim that they have been wrongly denied benefits. *This procedural protection, however, cannot confer [T]itle IV-E benefits without legal support or basis*." *Id.* at 17 (emphasis added).

CW did not meet the eligibility requirements for adoption assistance in 2014, thus relieving CHS of any liability for a supposed "failure to adequately advise Petitioners of the availability of adoption assistance and the requirements of the same." Moreover, the Federal Policy Announcement makes clear that the superior court's conclusion that DHHS and DSS had an "affirmative duty to provide information to Petitioners related to the potential availability of adoption assistance" is erroneous. Indeed, at the judicial-review hearing, counsel for both DHHS and DSS explained that each respective agency was unaware of CW's private adoption through CHS.

Our dissenting colleague views this case as concerning "Respondents' duty to fully share and inform prospective adoptive parents of their knowledge of specific facts of a child's health conditions and needs and prognosis gained exclusively through their care, custody, and control over the child." *Dissent*, slip op. at *3.

18

However, as DSS and DHHS make clear in their appellate briefs, "there is nothing in the record to indicate that either . . . DSS or DHHS were actually aware of the private adoption proceedings entered into by [CHS] and Petitioners prior to the finalization of CW's adoption in 2014." Indeed, nothing in the record supports the trial court's finding that "Respondents were well aware of CW's special needs prior to adoption, as CW received Medicaid from birth until shortly after the finalization of his adoption." In so finding, the superior court improperly imputed to DSS and DHHS knowledge of CW, his condition, and his adoption, and impermissibly exceeded its limited standard of review by making its own findings of fact that were not supported by the whole record. *See Sound Rivers*, 385 N.C. at 3, 891 S.E.2d at 85.

As for the period of "care, custody, and control over the child" on which our dissenting colleague focuses, *dissent* at *3, the record reflects that the period in which CHS had sole custody of CW before placing him with Petitioners was between four days and three weeks, not six months. As the superior court correctly noted, CHS placed CW with Petitioners in June 2021, and the record reflects that when three-week-old CW was seen in the emergency department, Petitioners were present as "his adoptive parents[.]"

Rather than concerning any "affirmative duty" on the part of any of the Respondents "to use their knowledge and expertise and to share the information they have gained and the potential availability of means to defray costs and accomplish identified special needs[,]" as our dissenting colleague posits, *id.* at *8, this appeal is

properly focused on the superior court's appropriate standards of review. DHHS's final decision reflected an accurate interpretation of the applicable federal and state statutes and regulations, and an appropriate application of the facts presented to the law. The superior court exceeded the limits of the applicable standards of review by concluding that CW was eligible for adoption assistance benefits, that "Respondents' actions were without substantial justification," and that there were extenuating circumstances justifying a reconsideration of CW's eligibility. The superior court did not properly apply the appropriate standards of review, and improperly "weigh[ed] the evidence presented to [DHHS] and substitute[d] its evaluation of the evidence for that of [DHHS]." *Id.* (citation omitted). Accordingly, the superior court's order reversing DHHS's final decision must be reversed.

In light of our disposition, we decline to address the arguments presented by CHS and DSS regarding whether the superior court lacked jurisdiction on appeal from DHHS's final decision to enter an order against those entities.

### III.    Conclusion

For the foregoing reasons, we reverse the superior court's order, which reversed the final decision of DHHS.

REVERSED.

Judge STROUD concurs.

Judge TYSON dissents by separate opinion.

TYSON, Judge, dissenting.

Respondents, NC DHHS, CHS, and Forsyth County DSS failed to carry their burden to show any error and prejudice in the superior court's order. The order is properly affirmed.

The issue before us is simple: What duty, if any, did Respondents possess to disclose the potential availability of State and Federal adoption assistance benefits to Petitioners, prior to Petitioners' adoption of C.W.? C.W. was under CHS' and DSS' sole legal custody, care, and control and possessed expertise and specialized knowledge of these programs. The superior court correctly found CHS and DSS owed such duties, had failed to disclose, and are liable to Petitioners. The superior court reviewed the whole record, found, and concluded: "Based on C[.]W[.]'s past and present medical history and circumstances, C[.]W[.] qualified as a 'special needs' child in 2014, and he still meets those qualifications today[.]" I respectfully dissent.

## IV. Jurisdiction

The Superior Court possessed jurisdiction to hear the petition involving a final agency decision pursuant to N.C. Gen. Stat. § 108A-79(k) (2023). This Court possesses jurisdiction pursuant to N.C. Gen. Stat. § 7A-27(b)(1) (2023).

## V. Background

C.W.'s mother was addicted to and had ingested various illegal drugs, while he was *in utero*. C.W. was delivered prematurely at 34 weeks by Cesarean Section on 28 May 2014. C.W. weighed 5 pounds 11.7 ounces at birth. C.W. tested positive at

birth for the presence of Cocaine, Opiates, Amphetamines, Benzodiazepines, and Marijuana. He was treated for the effects of premature delivery and the effects of the illicit drugs in his body and remained hospitalized for two weeks after birth. C.W. was diagnosed having Monofixation Syndrome, hyperopia, ptosis, and accommodative esotrapia. CHS gained exclusive care, custody, and control over C.W. shortly after he was born.

The superior court correctly found DSS became involved with C.W. by receiving an application for, seeking, and securing Medicaid benefits for him. C.W. remained within CHS' and DSS' legal care, custody, and control until his adoption by Petitioners was finalized 23 December 2014. Despite C.W.'s health and history at birth, and the treatments he had received while in CHS' legal custody, it is undisputed Petitioners received no disclosure or discussion of adoption assistance benefits potentially available under 42 U.S.C. § 673(a)(2). *See* 10A N.C. Admin. Code 70M.0402(a)(2) (2023) (incorporating by reference the eligibility criteria for adoption assistance benefits found in 42 U.S.C. § 673(a)(2) (2018)).

Petitioners formally adopted C.W. on 23 December 2014. C.W. has been diagnosed with attention-deficit/hyperactivity disorder and various vision/ocular conditions. C.W.'s multiple evaluations also show potential autism spectrum disorders.

The whole record clearly shows, and the superior court correctly found: "Respondents were well aware of C[.]W[.]'s special needs prior to adoption, as C[.]W[.]

received Medicaid from birth until shortly after the finalization of his adoption." The superior court also found and concluded: "C[.]W[.] would have been eligible to receive adoption assistance as of December 2014, and . . . it is clear that C[.]W[.] is still currently eligible to receive adoption assistance."

## VI.    N.C. Gen. Stat. § 108A-49(b)

N.C. Gen. Stat. § 108A-49(b) requires "the child ha[ve] special needs which create a financial barrier to adoption." N.C. Gen. Stat. § 108A-49(b) (2023). This statute incorporates the Federal adoption assistance requirement that, a determination of "special needs" requires, *inter alia*, the presence of "a specific factor or condition . . . because of which it is reasonable to conclude that such child cannot be placed with adoptive parents without providing adoption [financial] assistance[.]" 42 U.S.C. § 673(c)(1)(B).

Respondents and the majority's opinion assert Petitioners cannot meet these statutory thresholds. I disagree. Theirs is an *ipso facto* argument, which seeks to excuse or obliterate Respondents' duty to fully share and inform prospective adoptive parents of their knowledge of specific facts of a child's health conditions and needs and prognosis gained exclusively through their care, custody, and control over the child.

This duty is particularly relevant when the prospective adoptive parents cannot access the relinquishing parent and do not know the child's family health history, genetic predisposition, or inherited traits. To use these statutes as purported

authority to withhold or excuse failure to disclose critical health information needed and potential financial resources available to properly care for the child is an anathema to the very reasons these assistance programs exist.

As the superior court properly found and concluded, the "financial barrier to adoption" requirement only exists within the context of and after full disclosure by CHS and DSS of all known and relevant information about the child's health and conditions and prognosis to the prospective parents in order to enable them to assess needs and available resources, and to make an informed decision. N.C. Gen. Stat. § 108A-49(b) (providing the "financial barrier to adoption" requirement). This is particularly true with a newborn or infant child, as here, where the child's medical history, evaluations, and prognosis lies solely and exclusively with Respondents.

The superior court properly focused on what CHS and DSS knew or should have known and failed to disclose about C.W.'s condition, needs, and prognosis before and, at a minimum, between his birth in May 2014 and his adoption by Petitioners the following December. Respondents, not Petitioners, had a contract with C.W.'s mother before, during, and after his birth and exercised exclusive control over his medical care and treatments until he was formally placed with Petitioners in September 2014. Respondents continued to exercise legal custody and control over C.W. until his adoption was completed in December 2014. The superior court correctly rejected Respondents' specious argument that Petitioners could not satisfy this required "financial barrier to adoption" without Petitioners first being fully

informed by Respondents.  N.C. Gen. Stat. § 108A-49(b).

**VII.    Assistance application be signed and approved prior to adoption**

Federal and state regulations require the adoption assistance application to be signed and approved "*prior to*" the adoption becoming final.  10A N.C. Admin. Code 70M.0402(b)(4) (2014) (emphasis supplied); *see also* 45 C.F.R. 1356.40(b)(1) (2012) (explaining the "adoption assistance agreement" must "[b]e signed and in effect at the time of or prior to the final decree of adoption").

The whole record shows Petitioners and CHS eventually completed an adoption assistance eligibility checklist.  Petitioners submitted an application for adoption assistance on 10 May 2021.  DSS received the application and "inquired if there was a date scheduled for finalizing the adoption as 'the adoption agreement will have to be completed and signed prior to finalizing' the adoption."

CHS informed DSS "the adoption was finalized in 2014"; admitted "an adoption assistance application was not completed at that time"; and, that " '[t]his was a private adoption where [CHS] was the legal guardian prior to the adoption being finalized.' "

The superior court properly relied upon the whole record and the existence of these "extenuating circumstances" to conclude "this matter [needed] to be re-opened and a subsequent determination [made] of C[.]W[.]'s eligibility for adoption assistance."  The "extenuating circumstances" cited in addition to the facts stated above were Respondents' "arbitrary and capricious and bad faith" actions.

The presence and use of "extenuating circumstances" has been applied to excuse strict compliance with the "prior to" requirement when interpreting Title IV-E by other jurisdictions relying on federal policy statements from 1992 and 2001. The Supreme Court of Pennsylvania explained, in *Laird v. Department of Public Welfare*, a 1992 federal policy statement formed the basis for the "extenuating circumstances" doctrine. 23 A.3d 1015, 1024 (Pa. 2011). The earlier Federal guidance "stated that adoptive parents would be eligible for a fair hearing if a state agency charged with the administration of adoption subsid[i]es failed to notify adoptive parents of the availability of subsidies[.]" *Id.*

The 2001 Federal Policy Announcement "clarified several outstanding adoption assistance questions, while also revoking fifteen previously issued policy statements and interpretations[,]" including the 1992 policy statement that formed the basis for the extenuating circumstances doctrine. *Id.* at 1025 (citing U.S. Dep't of Health & Hum. Servs., Admin. for Child., Youth & Fams., Pol'y Announcement, Log No. ACYF-CB-PA-01-01 (Jan. 23, 2001) ("2001 Federal Policy Announcement"). The 2001 Federal Policy Announcement "did not abolish the extenuating circumstances doctrine; rather, it detailed various clarifications to it." *Id.*

The superior court correctly relied upon, cited, and summarized the 2001 Federal Policy Announcement as follows:

> c. *Adoption agencies, <u>whether public or private</u>, have an <u>affirmative duty</u> to notify prospective adoptive parents and prospective legal guardians of the availability of*

> *adoption assistance.*
>
> d. *Failure* by the State agency *to advise potential adoptive parents* about the availability of adoption assistance is *an extenuating circumstance*, which justifies a fair hearing and a subsequent grant of adoption assistance if the child meets the eligibility requirements.

(emphasis supplied).

The superior court correctly found and concluded the 2001 Federal Policy Announcement mandates: "the State or local [T]itle IV-E agency is responsible for assuring that prospective adoptive families with whom they place eligible children who are under their responsibility are apprised of the availability of [T]itle IV-E adoption assistance." 2001 Federal Policy Announcement, ACYF-CB-PA-01-01, at 13.

The superior court properly considered DSS' role and involvement in securing Medicaid coverage for C.W. and CHS' involvement or knowledge of the State or local Title IV-E agency. The 2001 Federal Policy Announcement reiterates: "The right to a fair hearing is a procedural protection that provides due process for individuals who claim that they have been wrongly denied benefits. This procedural protection, however, cannot confer [T]itle IV-E benefits without legal support or basis." *Id.* at 17.

The "legal support or basis" the superior court found upon review of the whole record was, "Respondents were well aware of C[.]W[.]'s special needs prior to adoption, as C[.]W[.] received Medicaid from birth until shortly after the finalization of his adoption." DSS, along with CHS, were privy to all of C.W.'s family and medical

history, diagnoses at birth, tests, evaluations, and prognoses from his birth for over six months until the adoption was finalized. Respondents possessed exclusive and specialized knowledge and skills, which they failed to share with Petitioners.

## VIII.    Conclusion

Our common sense of transparency and fairness is violated when the "ball is hidden" or by failure to speak when a duty to speak exists. While acts of omission may not be regarded as culpable as affirmative or willful acts of commission, adoption is not like an AS-IS; WHERE-IS, WITH ALL FAULTS commercial transaction.

This duty to disclose is particularly relevant in infants, as here, where critical needs, risks, and prognosis must be shared to allow the adoptive parents to plan to meet both known or likely needs. This "affirmative duty" to disclose is reinforced by Federal and State policies to assist and supplement orphaned or abandoned children with known special needs to promote adoptions and cease or reduce them being public charges.

To fully assess and plan for future needs, prospective adoptive parents must be provided with known medical, mental, physical needs, and prognoses, and of the availability of public assistance to fulfill these special needs. The superior court correctly found and concluded public and private agencies involved in these adoption processes owe an "affirmative duty" to use their knowledge and expertise and to share the information they have gained and the potential availability of means to defray costs and accomplish identified special needs.

The superior court reviewed the whole record and found: "Respondents were well aware of C[.]W[.]'s special needs prior to adoption, as C[.]W[.] received Medicaid from birth until shortly after the finalization of his adoption," and that "C[.]W[.] would have been eligible to receive adoption assistance as of December 2014, and . . . it is clear that C[.]W[.] is still currently eligible to receive adoption assistance."

These properly supported findings from the whole record support the superior court's conclusion that "Petitioners are entitled to receive adoption assistance both from the date of this Order, and retroactive assistance to December 23, 2014[.]" The superior court's order also remanded the matter "to Respondents for a determination of the amount of adoption assistance to which Petitioners are entitled" and for the execution of "all necessary documents in order for Petitioners to receive adoption assistance retroactive to December 23, 2014 and continuing thereafter as long as C[.]W[.] meets eligibility requirements[.]" The court in its discretion also properly found and awarded Petitioners reimbursement of $10,750.00 in attorney's fees as the prevailing party.

CHS and DSS failed to carry their burden to show error and prejudice in the superior court's order. The order is properly affirmed. I respectfully dissent.